UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

United States of America,

      Plaintiff,        Civil No. 21-cv-10928

vs.
               Honorable Denise Page Hood

$3,840,772.58 U.S. dollars constituting
125 international wire transfers seized
from U.S. correspondent bank, Citibank,
between December 21, 2020 and
January 4, 2021,

$1,025,446.18 U.S. dollars constituting
42 international wire transfers seized
from U.S. correspondent bank, JPMorgan
Chase Bank, between December 21, 2020
and January 4, 2021,

$765,143.73 U.S. dollars constituting
40 international wire transfers seized
from U.S. correspondent bank, Bank of
New York Mellon, between December 21, 2020
and January 4, 2021,

$145,466.52 U.S. dollars constituting
6 international wire transfers seized
from U.S. correspondent bank, Mashreq
Bank PSC, between December 21, 2020
and January 4, 2021,

$387,337.51 U.S. dollars constituting
13 international wire transfers seized
from U.S. correspondent bank, Standard
Chartered Bank, between December 21, 2020

and January 4, 2021,

$159,616.77 U.S. dollars constituting
6 international wire transfers seized
from U.S. correspondent bank, Deutsche
Bank Trust Company Americas, between
December 21, 2020 and January 4, 2021,

$2,288,936.63 U.S. dollars constituting
67 wire transfers seized from U.S.
correspondent bank, Citibank, N.A.,
between May 3, 2021 and May 21, 2021,

$1,449,112.82 U.S. dollars constituting
44 wire transfers seized from U.S.
correspondent bank, JPMorgan Chase Bank,
between May 3, 2021 and May 21, 2021,

$1,348,713 U.S. dollars constituting
44 wire transfers seized from U.S.
correspondent bank, Bank of America,
between May 3, 2021 and May 21, 2021,

$636,373.90 U.S. dollars constituting
28 wire transfers seized from U.S.
correspondent bank, Bank of New York Mellon;
between May 3, 2021 and May 21, 2021,

$20,155 U.S. dollars constituting
2 wire transfers seized from U.S.
correspondent bank, Deutsche Bank
and Trust Company Americas; between
May 3, 2021 and May 21, 2021, and

$34,000 U.S. dollars constituting
2 wire transfers seized from U.S.

correspondent bank, Mashreq Bank PSC,
between May 3, 2021 and May 21, 2021,

                    Defendants *in Rem*.
_____/

## SECOND AMENDED COMPLAINT FOR FORFEITURE

NOW COMES Plaintiff, the United States of America, by and through Saima S. Mohsin, Acting United States Attorney for the Eastern District of Michigan, Gjon Juncaj, Assistant United States Attorney, and Michael El-Zein, Assistant United States Attorney, and for its Complaint for Forfeiture states:

## JURISDICTION AND VENUE

1.     This is an *in rem* civil forfeiture action pursuant to 18 U.S.C. § 981(a)(1)(A).

2.     This Court has original jurisdiction over this proceeding pursuant to 28 U.S.C. § 1345 because this action is being commenced by the United States of America as Plaintiff.

3.     This Court has jurisdiction over this forfeiture action pursuant to 28 U.S.C. § 1355(b)(1)(A) because acts giving rise to the forfeiture occurred in the Eastern District of Michigan.

3

4.     Venue is proper before this Court pursuant to 28 U.S.C.
§ 1391(b)(2) because a substantial part of the events or omissions giving
rise to the Plaintiff's claims occurred in the Eastern District of
Michigan.

5.     Venue is also proper before this Court pursuant to 28 U.S.C.
§ 1395(c) because the Defendants *in rem* are located in the Eastern
District of Michigan.

## BACKGROUND INFORMATION

6.     The Defendants *in rem* consist of U.S. dollars wired from, or
intended to be wired to, the bank accounts of certain general trading
companies mostly located in Dubai, United Arab Emirates (UAE). The
Defendants *in rem* were seized in the United States pursuant to seizure
warrants authorized by the United States District Court for the Eastern
District of Michigan. The judicially authorized seizures of the
Defendants *in rem* occurred during two time periods: 1) between
December 21, 2020 and January 4, 2021 ("the first seizure"), as further
detailed in Exhibit 1, and 2) between May 3, 2021 and May 21, 2021
("the second seizure"), as further detailed in Exhibit 2. The Defendants

4

*in rem* total 419 U.S. dollar wire transfers.

7.    The Defendants *in rem* from the first seizure include 232 U.S. dollar wire transfers, totaling \$6,322,719.29. The Defendants *in rem* from the first seizure, detailed in Exhibit 1, more specifically consist of the following:

    a.  \$3,840,772.58 U.S. dollars constituting 125 international wire transfers seized from U.S. correspondent bank, Citibank, N.A.;

    b.  \$1,025,446.18 U.S. dollars constituting 42 international wire transfers seized from U.S. correspondent bank, JPMorgan Chase Bank;

    c.  \$765,143.73 U.S. dollars constituting 40 international wire transfers seized from U.S. correspondent bank, Bank of New York Mellon, between December 21, 2020 and January 4, 2021;

    d.  \$145,466.52 U.S. dollars constituting 6 international wire transfers seized from U.S. correspondent bank, Mashreq Bank PSC;

  e. $387,337.51 U.S. dollars constituting 13 international wire transfers seized from U.S. correspondent bank, Standard Chartered Bank, between December 21, 2020 and January 4, 2021; and

  f. $159,616.77 U.S. dollars constituting 6 international wire transfers seized from U.S. correspondent bank, Deutsche Bank Trust Company Americas.

A complaint for forfeiture against all but $944 of these Defendants *in rem* was filed under seal on or about April 26, 2021.

  8. The Defendants *in rem* from the second seizure include 187 U.S. dollar wire transfers, totaling $5,777,291.35. The Defendants *in rem* from the second seizure, detailed in Exhibit 2, more specifically consist of the following:

  a. $2,288,936.63 U.S. dollars constituting 67 wire transfers seized from U.S. correspondent bank, Citibank, N.A., between May 3, 2021 and May 21, 2021;

  b. $1,449,112.82 U.S. dollars constituting 44 international wire transfers seized from U.S. correspondent bank,

JPMorgan Chase Bank;

c.   $1,348,713 U.S. dollars constituting 44 wire transfers seized from U.S. correspondent bank, Bank of America, between May 3, 2021 and May 21, 2021;

d.   $636,373.90 U.S. dollars constituting 28 wire transfers seized from U.S. correspondent bank, Bank of New York Mellon; between May 3, 2021 and May 21, 2021;

e.   $20,155 U.S. dollars constituting 2 wire transfers seized from U.S. correspondent bank, Deutsche Bank and Trust Company Americas; between May 3, 2021 and May 21, 2021; and

f.   $34,000 U.S. dollars constituting 2 international wire transfers seized from U.S. correspondent bank, Mashreq Bank PSC.

9.   An Amended Complaint for Forfeiture against these Defendants *in rem* was filed under seal on or about August 11, 2021. The Amended Complaint for Forfeiture was unsealed on or about August 26, 2021.The Defendants *in rem* U.S. dollar wire funds are

property involved in a money laundering and/or unlicensed money transmitting conspiracy to unlawfully wire transfer U.S. dollars into and through the United States financial system, in violation of 18 U.S.C. §§ 371, 1956(h) and 1960. The Defendants *in rem* U.S. dollar wire funds are therefore subject to civil forfeiture to the United States pursuant to 18 U.S.C. § 981(a)(1)(A), as property involved in transactions or attempted transactions in violation of 18 U.S.C. § 1956 (money laundering) and/or 18 U.S.C. § 1960 (unlicensed money transmitting).

## UNDERLYING CRIMINAL STATUTES

10.    Pursuant to 18 U.S.C. § 371, if two or more persons to conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each person shall be fined or imprisoned not more than five years, or both.

11.    Pursuant to 18 U.S.C. § 1956(h), any person who conspires to commit any offense defined in 18 U.S.C. §§ 1956 or 1957 shall be

subject to the same penalties as those prescribed for the offense the commission of which was the object of the conspiracy.

12.    18 U.S.C. § 1956(a)(1)(B) prohibits knowingly conducting a financial transaction involving the proceeds of "specified unlawful activity," knowing that the transaction is designed in whole or in part to: conceal or disguise the nature, the location, the source, the ownership, or the control of such proceeds; or, avoid a transaction reporting requirements.

13.    18 U.S.C. § 1956(a)(2) prohibits transporting, transmitting, or transferring, or attempting to transport, transmit, or transfer "a monetary instrument or funds from a place in the United States to or through a place outside the United States or to a place in the United States from or through a place outside the United States: (A) with the intent to promote the carrying on of specified unlawful activity, or (B) knowing that the monetary instrument or funds involved in the transportation, transmission, or transfer represent the proceeds of some form of unlawful activity and knowing that such transportation, transmission, or transfer is designed in whole or in part,

9

(i) to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity; or

(ii) to avoid a transaction reporting requirement under State or Federal law."

14.   18 U.S.C. § 1957 prohibits knowingly engaging, or attempting to engage, in a monetary transaction with proceeds of a specified unlawful activity in an amount greater than $10,000 by, though, or to a financial institution.

15.   Pursuant to 18 U.S.C. § 1956(f), there is extraterritorial jurisdiction over the conduct prohibited by 18 U.S.C. § 1956 if—

(1) the conduct is by a United States citizen or, in the case of a non-United States citizen, the conduct occurs in part in the United States; and

(2) the transaction or series of related transactions involves funds or monetary instruments of a value exceeding $10,000.

16.    18 U.S.C. § 1960 prohibits knowingly conducting, controlling, managing, supervising, directing, or owning all or part of an unlicensed money transmitting business.

17.    18 U.S.C. § 1960 defines an "unlicensed money transmitting business" as a money transmitting business which affects interstate or foreign commerce in any manner or degree and--

    a. is operated without an appropriate money transmitting license in a State where such operation is punishable as a misdemeanor or a felony under State law, whether or not the defendant knew that the operation was required to be licensed or that the operation was so punishable;

    b. fails to comply with the money transmitting business registration requirements under section 5330 of title 31, United States Code, or regulations prescribed under such section; or

    c. otherwise involves the transportation or transmission of funds that are known to the defendant to have been derived from a criminal offense or are intended to be used

to promote or support unlawful activity.

18.   18 U.S.C. § 1960 defines "money transmitting" to include transferring funds on behalf of the public by any and all means including but not limited to transfers within this country or to locations abroad by wire, check, draft, facsimile, or courier.

19.   18 U.S.C. § 1956 sets forth a list of "specified unlawful activities," which includes any activity or act constituting an offense listed in 18 U.S.C. § 1961(1) and 18 U.S.C. § 1956(c)(7). Controlled substance offenses, such as violations of 21 U.S.C. §§ 841 and 846, are specified unlawful activities. Money laundering violations under 18 U.S.C. § 1956, and operating an unlicensed money transmitting business in violation of 18 U.S.C. § 1960, are also specified unlawful activities.

## STATUTORY BASIS FOR CIVIL FORFEITURE

20.   18 U.S.C. § 981(a)(1)(A) provides for the forfeiture of "Any property, real or personal, involved in a transaction or attempted transaction in violation of section 1956, 1957 or 1960 of this title, or any property traceable to such property."

## GENERAL ALLEGATIONS

21.    General Trading Companies (GTCs) are distribution companies that buy commodities from a source in one part of the world and then sell them to a largescale buyer in another part of the world. The largescale buyer will then further sell the goods down the stream of commerce to an eventual customer. GTCs are not involved in the production or manufacturing of the goods traded.

22.    Commodities traded in the world market are often priced in U.S. dollars. As a result, the U.S. dollar is a standard settlement currency used for international business transactions, including those transactions facilitated by GTCs. Electronic wire transfers of U.S. currency, even those not involving any U.S. counterparties, typically flow through U.S. financial institutions. Originator and beneficiary foreign financial institutions exchanging electronic funds in U.S. dollars rarely deal with one another directly. Instead, their wire transfers are usually delivered through a series of intermediary financial institutions, also known as correspondent banks, at least one of which is located in the United States.

23.    A "shell company" is a business entity that typically has no physical presence (other than a mailing address) and generates little to no independent economic value. Although they are not illegal in form, shell companies are commonly used to facilitate illicit activity, including money laundering and tax evasion. A shell company can be used to hide the true source of funds and the identity the parties behind a financial transaction.

24.    At all relevant times to this Complaint, an organized group of individuals operated an unregistered U.S. dollar money transmitting and money laundering business (the "Shadow Exchange") based in Dubai, UAE. The Shadow Exchange provided services to persons seeking to transfer U.S. dollars in a manner calculated to avoid anti-money laundering measures of the financial system and the scrutiny of international law enforcement. The Shadow Exchange also conspired with store-front money exchanges located in Dubai that seek to avoid complying with anti-money laundering laws of the United Arab Emirates and the United States. Customers of the Shadow Exchange also included at least one international criminal organization.

14

25.     The Shadow Exchange provided its illegal money transmitting and money laundering services by utilizing GTCs as shell companies to internationally transfer U.S. dollars. The numerous GTCs, mostly based in Dubai, have the appearance of operating independently but are in fact all utilized as payment vessels for the Shadow Exchange.

26.     The GTCs utilized by the Shadow Exchange included companies that are purely money transmitting vessels with no legitimate business. The Shadow Exchange also utilized the bank accounts of operational GTC businesses to process its illegal U.S. dollar wire transfers. Whether or not the GTCs conducted some legitimate business, the Shadow Exchange used the GTCs as shells to obfuscate the true source of the U.S. dollar funds being wired, the purpose of the transactions being conducted, and the identity of the senders and/or beneficiaries of the transaction.

27.     To facilitate the conspiracy, the Shadow Exchange also created fraudulent documents for the purposes of concealing the true funding source of its international U.S. dollar wire transactions. The fraudulent documents were provided to financial institutions and U.S.

investigators for the purpose of misleading entities attempting to verify the true purpose and source of the financial transactions initiated by the Shadow Exchange through its ready stable of GTCs.

28.     The use of fraudulent documents includes the Shadow Exchange presenting falsified documents to U.S. investigators regarding Defendant *in rem* wire transactions. For example, on or about December 24, 2020, PERFECT FRAME GOODS WHOLESALER LLC (PERFECT FRAME), a Shadow Exchange GTC, initiated a wire transfer to a company in California, USA. The funds were seized by the United States pursuant to an authorized seizure warrant, and is reflected in Exhibit 1, Wire Transfer No. 174.

29.     A party representing itself as PERFECT FRAME initiated email correspondence with an investigator of the United States. In that email correspondence, on or about January 26, 2021, PERFECT FRAME provided a "commercial invoice" purportedly issued by the California company, a seller of goods, that was involved in the business transaction PERFECT FRAME intended to act as an unlicensed money transmitter for. The invoice provided by PERFECT FRAME purports to

16

show PERFECT FRAME as the "Notify Party" in the transaction while a company in Lahore, Pakistan is listed as the "Sold, Duty and Tax Billed To" buyer. The California company confirmed it had created a commercial invoice to sell goods to a company in Lahore, Pakistan, but it had no knowledge of, or business dealing with, a "PERFECT FRAME" regarding the transaction. PERFECT FRAME is not referenced in the true invoice. The Shadow Exchange, through its shell GTC, PERFECT FRAME, altered the invoice in several ways to obfuscate that PERFECT FRAME served only as an unlicensed U.S. dollar money transmitter in the transaction. A comparison of the fraudulent invoice (on the left) with the true invoice (on the right) is one example of steps taken by the Shadow Exchange to conceal the underlying conspiracy to operate an unlicensed money transmitting and money laundering service (redacted – distinctions outlined in red):

False Invoice                          True Invoice



30.   The shell GTCs utilized by the Shadow Exchange in the underling conspiracy include, but are not limited to, the following companies:

a.  Advotis General Trading LLC;
b.  Camaro Impex General Trading LLC;
c.  Capricorn Goods Wholesalers LLC;
d.  Cloud One Trading Limited
e.  Dastagir General Trading FZE;
f.  Debonair Trading LLC;
g.  Esoon Trading LLC;
h.  Everventive Trading LLC;

18

      i.  Fresh Root Trading LLC;

      j.  Genesis Tech Pro PTE LTD;

      k. Growth Edge Investment LLC;

      l.  LDK Textile Trading LLC;

     m.Memon Empire Foodstuff Trading LLC;

      n. Middleby Middle East FZE;

      o. Nasa Motors FZE;

      p. Nebula Star Trading Limited;

      q. On Point Trading LLC;

      r.  Perfect Frame Goods Wholesalers LLC;

      s.  PostD Trading LLC;

      t.  Straight Way General Trading LLC; and

      u. Wheels on Deals FZE.

The shell GTCs referenced in this paragraph were primarily originators, but also beneficiaries, of many the wire transactions that constitute the Defendants *in rem*. Neither the Shadow Exchange, or the shell GTCs it utilizes, are licensed to operate as a money transmitting business in, to, or through the United States, and they are not registered with the U.S. Department of Treasury, Financial Crimes Enforcement Network, as required under 31 U.S.C. § 5330 and 31 C.F.R § 1022.380.

    31.  As a money transmitting services business, GTCs utilized as shell payment companies exhibit a one-way transaction pattern consistent with payment accounts, as opposed to a more balanced

volume of payments and receipts indicative of a legitimate company. For example, records of international U.S. dollar wire transactions, which flowed through at least one U.S. financial institution, were obtained and analyzed for IMPACT POINT TRADING, ON POINT TRADING, and DEBONAIR TRADING. Between approximately January 2020 to September 2020, the three Shadow Exchange GTCs were involved in the following amounts of U.S. dollars wired to or through the United States:

| January 2020 to September 2020 | | | | |
|---|---|---|---|---|
| GTC | Number of USD Wires Sent | Total Value of USD Wires Sent | Number of Wires Received | Total Value of USD Wires Received |
| IMPACT POINT TRADING | 2,018 | $125,004,595.24 | 67 | $11,474,041.99 |
| ON POINT TRADING | 1495 | $65,544,131.27 | 58 | $3,746,712.49 |
| DEBONAIR TRADING | 807 | $31,315,712.94 | 62 | $11,341,047.74 |
| TOTAL | 4320 | $221,864,439.45 | 187 | $26,561,802.22 |

32.    As shown by the table above, the GTCs sent out approximately eight-times more funds than they received. If the GTCs were conducting legitimate business, a more balanced pattern of incoming and outgoing wires would be seen.

33.    The wire transactions constituting the Defendants *in rem* show a similar pattern. For example, between the seizure period of December 21, 2020 and January 4, 2021, the following high-volume Shadow Exchange GTCs conducted at least the following U.S. dollar wire transactions to or through the United States:

| December 21, 2020 through January 4, 2021 | | | | |
|---|---|---|---|---|
| GTC | Number of USD Wires Sent | Total Value of USD Wires Sent | Number of Wires Received | Total Value of USD Wires Received |
| ADVOTIS GENERAL TRADING LLC | 35 | $1,302,341.52 | 3 | $252,699.53 |
| CAPRICORN GOODS WHOLESALERS L.L.C | 20 | $313,772.25 | 0 | $0 |
| FRESH ROOT TRADING LLC | 32 | $396,053.00 | 1 | $15,730.00 |
| GENESIS TECH PRO PTE LTD | 10 | $70,951.00 | 1 | $186,974.00 |
| LDK TEXTILE TRADING LLC | 11 | $361,780.00 | 1 | $32,975.00 |
| NASA MOTORS FZE | 32 | $1,009,356.78 | 3 | $25,286.00 |
| PERFECT FRAME GOODS WHOLESALERS LLC | 20 | $454,574.65 | 0 | $0 |
| WHEELS ON DEALS FZE | 37 | $1,097,186.00 | 4 | $33,955.00 |
| TOTAL | 197 | $5,006,015.20 | 13 | $547,619.53 |

34.    As shown in the table above, all together the referenced GTCs sent out significantly more wires and funds than they received. Furthermore, between May 5, 2021 and May 21, 2021, STRAIGHT WAY GENERAL TRADING LLC, made 70 Defendant *in rem* wire transfer payments, totaling $1,778,807, while it was the intended recipient of only 2 Defendant *in rem* wire transfer payments, totaling $207,832. This exhibits the same pattern observed in the January 2020 to September 2020 wire transfers of IMPACT POINT TRADING, ON POINT TRADING, and DEBONAIR TRADING.

35.    Many countries, including the UAE, require financial institutions and money transmitters to implement procedures designed to combat money laundering by verifying the identity and validity of transactions conducted by its customers. This practice is known as "Know Your Customer." To further facilitate its illegal activity and obfuscate the true nature and purpose of the GTC transfers, the Shadow Exchange responded to bank inquiries for verification of financial transactions with falsified invoices and falsified shipping

22

documents purporting to justify transactions scrutinized by financial institutions.

36.   The Shadow Exchange also services transnational criminal organizations without regard to the origins of the funds it is transmitting. For example, the Shadow Exchange conspired with a transnational drug trafficking organization to utilize multiple Shadow Exchange GTCs for the U.S. dollar purchase of armored vehicles from a foreign company. The underlying drug conspiracy was initiated in the Eastern District of Michigan. The Shadow Exchange wired the following U.S. Dollar payments to the foreign company for the purchase of the armored vehicles:

a.  $259,907.08 USD wire transfer, on or about April 16, 2020, originated by ON POINT TRADING in Dubai;

b.  $63,890 USD wire transfer, on or about June 16, 2020, originated by IMPACT POINT TRADING in Dubai; and

c.  $94,050 USD wire transfer, on or about September 13, 2020, originated by DEBONAIR TRADING in Dubai.

All U.S. dollar wire transactions referenced in this paragraph passed through and were processed by correspondent banks located in the United States.

37.    The originating wire transactions of the Shadow Exchange conspiracy are sent to beneficiaries in several countries, including the United States. Shadow Exchange wire transactions were also sent to beneficiaries or financial institutions located in the Eastern District of Michigan. For example, between January 2020 and September 2020, ON POINT TRADING originated at least three wires totaling $145,700 to "CSS Solutions," a company with a business address at 400 Renaissance Center located in Detroit, Michigan. However, CSS Solutions was not a tenant at the office space specified for it on the wire transaction, and the phone number listed for the company was not in service as far back as December 7, 2020. The wire records indicated the transfers were payment for the import of solar panels. CSS Solutions' website identified it as an IT Development and Consulting Company.

38.    In June of 2020, DEBONAIR TRADING originated a U.S. dollar wire to a company located in Albion, Michigan ("the Albion

24

company"). The beneficiary bank for the Albion company is Comerica Bank, with an address located in Detroit, Michigan. The wire was in the amount of $2,240 and wire records indicated it was for the import of electronic equipment. The Albion Company confirmed it sold electronic equipment to a company located overseas, but the company was not "Debonair Trading." The actual purchasing company overseas utilized the Shadow Exchange money transmitting service, and its shell GTC DEBONAIR TRADING, to pay the Albion company.

39.    The United States correspondent banks that processed many of the Defendants *in rem* wire transactions include banks with physical branch locations in the Eastern District of Michigan.

40.    The Defendants *in rem* U.S. dollar wire funds are property involved in a money laundering and/or unlicensed money transmitting conspiracy to wire transfer U.S. dollars into and through the United States, in violation of 18 U.S.C. §§ 371, 1956(h) and 1960.

41.    The Defendants *in rem* U.S. dollar wire funds are therefore forfeitable to the United States pursuant to 18 U.S.C. § 981(a)(1)(A), as property involved in violations of 18 U.S.C. § 1956 (money laundering)

and/or 18 U.S.C. § 1960 (unlicensed money transmitting business).

## CLAIM FOR RELIEF

42.   Plaintiff realleges and incorporates by reference each and every allegation contained in paragraphs 1 through 41 above, any subparagraphs thereunder, and Exhibits 1 and 2 to this Second Amended Complaint. The Defendants *in rem* U.S. dollar wire funds are property involved in a conspiracy to wire transfer U.S. dollars into and through the United States, in violation of 18 U.S.C. §§ 371, 1956(h) and 1960. The Defendants in rem U.S. dollar wire funds are therefore forfeitable to the United States pursuant to 18 U.S.C. § 981(a)(1)(A), as property involved transactions or attempted transactions in violation of 18 U.S.C. § 1956 (money laundering) and/or 18 U.S.C. § 1960 (unlicensed money transmitting business).

## CONCLUSION

Plaintiff, the United States of America, respectfully requests that a warrant for the arrest of the Defendants *in rem* be issued; that due notice be given to all interested parties to appear and show cause why the forfeiture should not be decreed; that judgment be entered declaring

the aforementioned Defendants *in rem* condemned and forfeited to the

United States of America for disposition according to law; and that the

United States of America be granted such other and further relief as

this Court may deem just and proper, together with the costs and

disbursements of this action.

Respectfully submitted,

SAIMA S. MOHSIN
Acting United States Attorney

s/ Gjon Juncaj
GJON JUNCAJ (P63256)
Assistant United States Attorney
211 W. Fort Street, Suite 2001
Detroit, Michigan 48226
Telephone:(313) 226-0209
gjon.juncaj@usdoj.gov

s/Michael El-Zein
MICHAEL EL-ZEIN (P79182)
Assistant United States Attorney
211 W. Fort Street, Suite 2001
Detroit, Michigan 48226
Telephone:(313) 226-9770
michael.el-zein@usdoj.gov

Dated: September 30, 2021

## **VERIFICATION**

I, DEREK NEWSOME, am a Special Agent of Internal Revenue Service, Criminal Investigations.  I have read the foregoing Complaint for Forfeiture and assert under penalty of perjury that the facts contained therein are true to the best of my knowledge and belief, based upon knowledge possessed by me and/or on information received from other law enforcement agents.

_____
Derek Newsome, Special Agent
Internal Revenue Service
Criminal Investigations

Dated: September 30, 2021